1  Robert C. Schubert S.B.N. 62684
   Juden Justice Reed S.B.N. 153748
2  Aaron H. Darsky S.B.N. 212229
   SCHUBERT & REED LLP
3  Three Embarcadero Center, Ste. 1650
   San Francisco, California 94111
4  Telephone: (415) 788-4220
5  Fax: (415) 788-0161
   Email: jreed@schubert-reed.com
6
7  *Proposed Local Counsel*

8  Kim E. Miller S.B.N. 178370
   KAHN GAUTHIER SWICK, LLC
9  12 E. 41st St., Ste. 1200
   New York, New York 10017
10 Tel: (212) 696-3730
11 Fax: (504) 455-1498
   E-mail: kim.miller@kgscounsel.com
12
13 *Proposed Lead Counsel for Lead Plaintiff and the Class*

14                UNITED STATES DISTRICT COURT
15               NORTHERN DISTRICT OF CALIFORNIA
16

17 NICK POURNARAS, Individually And On        )
18 Behalf of All Others Similarly Situated,   )   CIVIL ACTION NO. _C 07 4600_
                                              )
19                          Plaintiff,        )
                                              )
20        vs.                                 )   CLASS ACTION COMPLAINT **CRB**
                                              )   FOR VIOLATIONS OF
21 PEGASUS WIRELESS CORPORATION,              )   FEDERAL SECURITIES LAWS
   POLLARD- KELLEY AUDITING                   )
22 SERVICES, INC., JASPER KNABB,              )
   STEPHEN DURLAND, ALEX TSAO,                )   JURY TRIAL DEMANDED
23 CASPAR LEE, JERRY SHIH,                    )
   NICHOLAS PERATICOS, WILLIAM                )
24 HORN, EDWARD CELANO, MICHAEL               )
25 EATON, ERIC LUTZ, and DOUGLAS              )
   HIRSCH.                                    )
26
27                          Defendants.
28

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

This is a federal class action on behalf of those who purchased or otherwise acquired the common stock of Pegasus Wireless Corp. ("Pegasus" or the "Company") between December 22, 2005, and September 5, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, defendants published a series of materially false and misleading statements which defendants knew and/or deliberately disregarded were materially false and misleading at the time of such publication, and which omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

## JURISDICTION AND VENUE

1.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

3.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). At the time of the wrongdoing, Defendant Pegasus was headquartered in this District. Defendants Alex Tsao and Jerry Shih are domiciled in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

4.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

5.     Plaintiff Nick Pournaras, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Pegasus at artificially-inflated prices during the Class Period and has been damaged thereby.  Mr. Pournaras is a member of the Lead Plaintiff movant, the Pournaras Group.

6.     Defendant Pegasus Wireless Corp. is a Nevada corporation.  During the Class Period, the Company was headquartered at 48499 Milmont Drive, Fremont, CA 94538.  According to the Company's profile:

> Pegasus Wireless Corp. engages in design, manufacture, and marketing of wireless hardware and software solutions for broadband fixed, portable networking, and Internet access worldwide. It offers various products in three major application areas: indoor and outdoor wireless networking, industrial wireless networking solutions, and wireless multimedia/video networking solutions.

7.     Defendant Pollard-Kelley Auditing Services, Inc. ("Pollard-Kelley") is a Colorado Company with its business address at 1900 Rocky Spring Dr., Lake City, CO 81235.  According the Pollard-Kelly's website:

> Pollard-Kelley Auditing Services, Inc is a Certified Public Accounting Firm which specializes in auditing. We are PCAOB qualified and our practice is limited primarily to the audits of publicly traded companies [including] Financial Audits, PCAOB Audits, Mergers & Acquisitions, Sarbanes-Oxley Compliance Services.

Pollard-Kelly was Pegasus Wireless Corp.'s auditor during the Class Period and signed the Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB and 2006 Form 10-KSB.

8.     Defendant Jasper Knabb ("Knabb") was, during the Class Period, Chief Executive Officer, President and a member of the Board of Directors of the Company.  During the Class Period, Knabb signed and certified the Company's SEC filings, including but not limited to Pegasus' interim Form(s) 10-QSB, 2005 Form 10-KSB, and 2006 Form 10-KSB.

1    9.    Defendant Stephen Durland ("Durland") was, during the Class Period, Chief

2    Financial Officer and a member of the Board of Directors of the Company.  During the Class Period,

3    Durland signed and certified the Company's SEC filings, including but not limited to Pegasus'

4    interim Form(s) 10-QSB, 2005 Form 10-KSB, and 2006 Form 10-KSB.

5    10.    Defendant Alex Tsao ("Tsao") was, during the Class Period, Chief Executive

6    Officer and the Chairman of the Board of Directors of the Company.  During the Class Period, Tsao

7    signed and certified the Company's SEC filings, including but not limited to Pegasus' interim Form

8    10-QSB and 2005 Form 10-KSB.

9    11.    Defendant Caspar Lee ("Lee") was, during the Class Period, a member of the

10   Board of Directors of the Company.  During the Class Period, Lee signed and certified the

11   Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.

12   12.    Defendant Jerry Shih ("Shih") was during the Class Period, a member of the Board

13   of Directors of the Company.  During the Class Period, Shih signed and certified the Company's

14   SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.

15   13.    Defendant Nicholas Peraticos ("Peraticos") was during the Class Period, a member

16   of the Board of Directors of the Company.  During the Class Period, Peraticos signed and certified

17   the Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.

18   14.    Defendant William Horn ("Horn") was during the Class Period, a member of the

19   Board of Directors of the Company.  During the Class Period, Horn signed and certified the

20   Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB, and 2006 Form

21   10-KSB.

22   15.    Defendant Edward Celano ("Celano") was during the Class Period, a member of

23   the Board of Directors of the Company.  During the Class Period, Celano signed and certified the

24   Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.

16.     Defendant Michael Eaton ("Eaton") was during the Class Period, a member of the Board of Directors of the Company.  During the Class Period, Eaton signed and certified the Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.

17.     Defendant Eric Lutz ("Lutz") was during the Class Period, a member of the Board of Directors of the Company.  During the Class Period, Lutz signed and certified the Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.

18.     Defendant Douglas Hirsch ("Hirsch") was during the Class Period, a member of the Board of Directors of the Company.  During the Class Period, Hirsch signed and certified the Company's SEC filings, including, but not limited to, Pegasus' 2005 Form 10-KSB.

19.     The defendants referenced above in ¶¶ 8-18 are referred to herein as the "Individual Defendants."

20.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

21.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly-defined group of defendants identified above.  Each of the above officers of Pegasus, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business,

1    operations, products, growth, financial statements, and financial condition, as alleged herein.  Said

2    defendants were involved in drafting, producing, reviewing and/or disseminating the false and

3    misleading statements and information alleged herein, were aware, or deliberately disregarded, that

4    the false and misleading statements were being issued regarding the Company, and approved or

5    ratified these statements, in violation of the federal securities laws.

6        22.     As officers and controlling persons of a publicly-held company whose common

7    stock was, and is, registered with the SEC pursuant to the Exchange Act and, during the Class

8    Period, was traded on the Nasdaq National Market Exchange (the "Nasdaq"), and governed by the

9    provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate

10   promptly, accurate and truthful information with respect to the Company's financial condition and

11   performance, growth, operations, financial statements, business, products, markets, management,

12   earnings and present and future business prospects, and to correct any previously-issued statements

13   that had become materially misleading or untrue, so that the market price of the Company's

14   publicly-traded common stock would be based upon truthful and accurate information.  The

15   Individual Defendants' misrepresentations and omissions during the Class Period violated these

16   specific requirements and obligations.

17       23.     The Individual Defendants participated in the drafting, preparation, and/or approval

18   of the various public and shareholder and investor reports and other communications complained of

19   herein and were aware of, or deliberately disregarded, the misstatements contained therein and

20   omissions therefrom, and were aware of their materially false and misleading nature.  Because of

21   their Board membership and/or executive and managerial positions with Pegasus, each of the

22   Individual Defendants had access to the adverse undisclosed information about Pegasus' business

23   prospects and financial condition and performance as particularized herein and knew (or deliberately

24   disregarded) that these adverse facts rendered the positive representations made by or about Pegasus

25   and its business issued or adopted by the Company materially false and misleading.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                                    - 5 -

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

25.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Pegasus common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme:  (i) deceived the investing public regarding Pegasus' business, operations, management and the intrinsic value of Pegasus common stock; (ii) enabled defendants to negotiate the acquisitions of several other smaller companies, often using Company stock as partial consideration while in possession of material adverse non-public information about Pegasus; and (iii) caused plaintiff and other members of the Class to purchase Pegasus common stock at artificially-inflated prices and to be damaged thereby.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Pegasus between December 22, 2005, and September 5, 2006, inclusive (the "Class") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families

1    and their legal representatives, heirs, successors or assigns and any entity in which defendants have

2    or had a controlling interest.

3          27.     The members of the Class are so numerous that joinder of all members is

4    impracticable.  During the Class Period, Pegasus common stock was actively traded on the Nasdaq.

5    As of June 30, 2006, the Company had over 78.683 million shares of common stock issued and

6    outstanding.[1] While the exact number of Class members is unknown to plaintiff at this time and can

7    only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or

8    thousands of members in the proposed Class.  Record owners and other members of the Class may

9    be identified from records maintained by Pegasus or its transfer agent and may be notified of the

10   pendency of this action by mail, using the form of notice similar to that customarily used in

11   securities class actions.

12         28.     Plaintiff's claims are typical of the claims of the members of the Class as all

13   members of the Class are similarly affected by defendants' wrongful conduct in violation of federal

14   law that is complained of herein.

15         29.     Plaintiff will fairly and adequately protect the interests of the members of the Class

16   and has retained counsel competent and experienced in class and securities litigation.

17         30.     Common questions of law and fact exist as to all members of the Class and

18   predominate over any questions solely affecting individual members of the Class.  Among the

19   questions of law and fact common to the Class are:

---

[1] On or about August 4, 2006, approximately 13 million shares of Company stock were reportedly "retired" by defendants, lowering the total number of shares outstanding to approximately 65.68 million shares.

A.    whether the federal securities laws were violated by defendants' acts as alleged herein;

B.    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pegasus; and

C.    to what extent the members of the Class have sustained damages and the proper measure of damages.

31.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Relevant Background Concerning the Company

32.    Pegasus is a company that has gone through a host of "costume changes" in the last several years.  Currently, the Company purports to provide wireless networking systems and claims to be "*a leading provider of advanced wireless solutions*."  Both prior to and throughout the Class Period, Pegasus consistently claimed to possess *"cutting-edge" technology for streaming video*. The Company's competitors include industry giants and product category leaders such as Cisco Systems, Linksys, D-Link, Netgear, and many others, including Microsoft, which also sells a line of routers.  While the Company does not appear to have any institutional ownership, Pegasus' most recent Form 10-KSB identified an entity called Vision 2000 Ventures, as a 12.7% owner of the Company's stock.  Vision 2000 Ventures has the same mailing address as Pegasus headquarters.

33.     Founded in 2000, Pegasus was originally organized as a Nevada software company called Burrard Technologies, Inc.   After failing in that business, however, the Company went dormant in December 2001.  In April 2002, the Company acquired a Swiss water-treatment operator, changed its name to Blue Industries, and began marketing an allegedly chemical-free water-treatment process.   Again, the Company's plan failed, and by December 2003 it again went inactive. In May 2005, the Company again changed its name yet again – this time to Pegasus Wireless Corp. -- and acquired a company called OTC Wireless, where Knabb had previously been a managing director.

34.     It was in connection with the OTC Wireless transaction that Knabb became associated with the Company.  Pegasus' SEC filings describe Knabb as follows:

> ***JASPER KNABB, President and Director, has more than 15 years experience in the high tech industry. Mr. Knabb's involvement in the technology business encompasses PC manufacturing and sales, computer gaming software development, Internet service provider and wireless system development and marketing.*** Prior to Pegasus Wireless, **Mr. Knabb was the President of Wireless Frontier, Inc.,** (OTC BB: WFRI), from 2003 to 2004 and was responsible for business development and successfully negotiating to bring the company to public via a reverse merger. Prior to Wireless Frontier, Mr. Knabb was a **Managing Director at OTC Wireless** responsible for business development from 2001 to 2002. Prior to OTC Wireless, Mr. Knabb founded and became the **President of Beach Access**, a privately held Internet Service Providing company, in 1998, and successfully sold the company in 2000.

35.     In truth, however, Knabb's history with OTC Wireless, Wireless Frontier and Beach Access – and his close business ties with convicted felons, securities fraudsters, and the like -- were significantly more complicated and questionable than defendants disclosed in the Company's SEC filings, as discussed in detail in the section below entitled "The True Facts Emerge."

36.     In addition to providing little or no detail about the prior history of the Company or its related party transactions, at no time during the Class Period did defendants disclose the manner in which Knabb financed the acquisition of tens of millions of dollars in Company stock he purported to purchase prior to and during the Class Period.  In total, Knabb reported to the SEC that

1  he had purchased more than $26 million in Pegasus shares between the beginning of 2005 and the

2  end of the Class Period.

3      37.    In fact, little if anything about Knabb's personal finances or his ability to pay for

4  $26 million in Company stock was disclosed to investors by the Company. However, what now

5  appears to be the reality based upon an exhaustive review of state and federal documents is the

6  following:

7

8  - While it was previously reported by *Investorideas.com* that Knabb sold his first company, Software Exchange Inc., d/b/a SEI, for $80 million, there does *not* appear to be any record of any $80 million sale of SEI stock by Knabb or any record that Knabb owned $80 million of SEI stock. What records do exist indicate that SEI filed for bankruptcy in the Middle District of North Carolina, on or about May 24, 1990.

9

10

11

12  - On April 1, 2000, Knabb was sued by BIFS Technologies Corp. ("BIFS"), a penny-stock company that had acquired BeachAcess.Net. [2] BIFS alleged that Knabb had misrepresented his ownership of BeachAccess, thus causing BIFS to attempt to purchase BeachAccess from Knabb and to enter into an employment agreement with him. The complaint further alleged that Knabb did not own BeachAccess. While the Court found that BIFS had the right to terminate Knabb, it allowed him to keep stock options he had already received. At the time of the ruling Knabb's rights to 12 million shares of BIFS were worth less than $36,000. BIFS was eventually de-listed from the Nasdaq Pink Sheets on July 28, 2005 as the result of an SEC Administrative Action that arose out of the company's inability to file timely financial statements.

13

14

15

16

17

18

19  - On January 14, 2002, a "Motion to Be Relieved as Counsel" for Mr. Knabb was filed against Knabb after he allegedly failed to pay attorney's fees in a lawsuit filed by Babak Dowlatshahi. Mr. Dowlatshahi had sold his company to Beach Access.Net, where Knabb served as Chief Executive Officer. In the lawsuit, Mr. Dowlatshahi claimed that the terms of the acquisition agreement were violated and that he had been harmed after Knabb stopped paying vendors, despite making assurances that he would.

20

21

22

23  - On March 17, 2003, a complaint was also filed in U.S. District Court seeking a judgment against Knabb in the amount of $934,081 plus attorneys' fees and other costs associated with the collection of the outstanding debt he and his wife owed on a boat. The matter was settled and the case was dismissed after Knabb lost possession of the boat.

24

25

26

27  _____

28  [2] On June 16, 2000, BIFS announced a "strategic alliance" with OTC Telecom. Defendant Knabb was then OTC's Managing Director; that company later changed its named to OTC Wireless and was acquired by Pegasus.

- SEC filings of Wireless Frontier, Inc. report that Knabb earned $196,808 as Director and President of that company from September 16, 2003 to September 16, of 2004. It appears that Knabb did not receive a salary while at Pegasus.

38.     The Company's lack of disclosure extended well beyond Knabb's personal finances. Thus, while Pegasus stated to investors that Knabb had been involved in companies such as BIFS Technologies and Wireless Frontier, at no time did defendants ever disclose that these companies were both penny stocks that had experienced very similar suspicious trading patterns - - both experiencing unusual dramatic increases followed by sudden and dramatic price declines, all within a very compressed time frame.

39.     This irregular and suspicious trading activity first occurred at BIFS. In early 2000, following the failure of that company, Knabb sold Beach Access to Biofiltration Systems, a Florida-based penny-stock concern. At that time, Biofiltration had no business operations or revenues of its own. Accordingly, to generate interest in BIFS stock, the company reportedly hired a stock promoter with a dubious criminal history to pump up its stock on the Over The Counter market. In the run-up that followed, Knabb offered to swap ownership of Beach Access for 12 million shares of Biofiltration stock, agreeing to stay on as head of what would become a Biofiltration subsidiary. At the time Knabb was an executive at BIFS Technologies, between March and August 2000, BIFS shares traded from $0.03 per share to $2.26 per share - - an increase of almost 7500%.     By December 2000, however, shares of BIFS had fallen back to $0.13 per share - - a 94% loss compared to August of that year.

40.     The pattern of a sudden rise and collapse of company stock associated with Knabb also occurred at Wireless Frontier. Four years after the collapse of BIFS, in 2004, when Knabb was CEO of Wireless Frontier, between January 2004 and March 2004, shares of Wireless Frontier increased from $0.15 to $0.90 per share - - *a gain of over 500%*. Almost as quickly as these shares

1   increased in value, however, by June 2004, shares of Wireless Frontier collapsed back to $0.13 per

2   share - - an 86% loss compared to March 2004.

### Defendants' Materially False and Misleading
### Statements and Omissions During the Class Period

41.    On December 22, 2005, the first day of the Class Period, Pegasus issued a release

announcing the acquisition of AMAX Engineering Corporation in a partial cash and stock based

transaction.  This release provided information about this transaction, in part, as follows:

**Pegasus Wireless Corporation Acquires AMAX Engineering Corporation for Distribution of Its Wireless Products; Company Now Owns One of Top Twenty-Five Distribution Centers in North America**

Pegasus Wireless Corporation (OTCBB:PGWC), a leading provider of advanced wireless solutions, announced today the acquisition of 51% controlling interest in AMAX Engineering Corporation for a combination of cash and restricted stock. *The cash portion was partially financed by the purchase of 571,429 restricted shares of Pegasus Wireless Corporation's common stock by Jasper Knabb, the Company President. The acquisition of the company and its distribution facility will allow Pegasus to expedite its wireless products domestically, therefore increasing the company's revenue, as well as profit.* Pegasus has previously been distributing its products from its manufacturing facilities overseas, and this acquisition will allow the company to provide end-to-end solutions for its clients, as well as meet the ever-increasing demand for its patented technology with greater confidence and rapidity.

Jasper Knabb stated, "*We are delighted to add AMAX to our team of dedicated professionals.* This company has established itself as a global leader in providing technology to all levels of the marketplace, and *we at Pegasus believe that the values and standards upheld by AMAX will be an excellent fit with our overall vision for the future of our company.*"

Knabb went on to say, "By bringing our operations into North America, especially into a reputable facility such as AMAX's, *Pegasus is looking forward to expanding our output of products without compromising our commitment to the execution of our business model, and the standards of excellence that we hold to the highest value.*" [Emphasis added.]

42.    The Company's December 22, 2005 release also described Pegasus and AMAX, in

part, as follows:

*Pegasus Wireless' dedication to providing the most feature-rich, flexible and robust hardware and software solutions has made it a leader in the wireless communications industry*, and has landed the company partnerships with large names such as Hitachi, Lexmark, and Dell. In the same fashion, AMAX Engineering has shown a strong commitment to providing the highest quality of products and services, has partnered with companies such as Intel and AMD, and has grown to become one of the top twenty-five distribution centers in North America. *Pegasus' attainment of AMAX will solidify its place as a significant force in the fast-growing world of wireless technology....*

About AMAX Engineering Corporation

AMAX Engineering Corporation, a privately-held company, was founded and headquartered in the heart of the Silicon Valley in 1979. *Over the years, AMAX has distinguished and established itself as a global leader in providing technology to all levels of the marketplace.* [Emphasis added.]

43.    One week later, on December 29, 2005, Pegasus published another release announcing the acquisition of CNet Technologies, Inc., a China-based manufacturer of wireless products.   This release stated, in part, the following:

**Pegasus Wireless Corporation Acquires CNet Technology, Inc., a China-Based Manufacturer for Manufacturing of Its Wireless Products; Facility Will Provide Pegasus with Manufacturing Capability Needed for Business Growth**

Pegasus Wireless Corporation (OTCBB:PGWC), a leading provider of advanced wireless solutions, announced today the acquisition of 51% controlling interest in CNet Technology, Inc., a China-based designer and manufacturer of computer network equipment, including wireless devices. *The acquisition will be financed by a purchase of 222,222 restricted shares of Pegasus Wireless Corporation's common stock by Jasper Knabb, Company's President. The cash equivalent of $1 million will be used for the purchase of CNet Technology, Inc., while the additional $1 million cash will be used to obtain raw materials to begin the manufacturing of Pegasus Wireless' products that will be available for distribution within thirty days. The acquisition of CNet's manufacturing subsidiary will allow Pegasus Wireless to accelerate the assembly of its own products as well as goods for companies abroad, which will ultimately increase profit margins. ...*

**Jasper Knabb** remarked, "*We are thrilled at the addition of CNet Technology, Inc. to our fast-growing group of committed and talented specialists. ...* **Knabb** further commented, *"Together with Pegasus' recent acquisition of AMAX Technology, CNet Technology adds another critical piece into Pegasus' overall plan to become a complete end-to-end network communication solution and technology provider."*

**Knabb** went on to say, "*The recognized capabilities of CNet Technology in*

*conjunction with the standards that we at Pegasus uphold will no doubt be an asset to our company, as well as a tool for the overall vision of future success and increased value to Pegasus Wireless shareholders.*" [Emphasis added.]

44.     The Company's December 29, 2005 release also described CNet, in part, as follows:

> CNet Technology, Inc. has been a leader in designing and manufacturing high-speed, cost-effective solutions for the worldwide networking and communications market. Their unique combination of sales and assembly has allowed for CNet to support a vast array of wireless demands, from the small and home offices to the vast enterprise systems that span multiple locations. *Pegasus Wireless will be assuming command of CNet's manufacturing facility and coupling the production of their own products with the already reputable CNet merchandise, which will leave their sales team to continue the tradition of excellence that has been established over the years.* [Emphasis added].

45.     The statements made by defendants and contained in the Company's December 22, 2005 release announcing the AMAX transaction, and the statements contained in the Company's December 29, 2005 release announcing the CNet acquisition were materially false and misleading and were known by defendants to be false at that time, or were deliberately disregarded as such thereby, due to the following adverse facts, known by Defendants but concealed from investors during the Class Period:

(a)     The acquisitions of AMAX and CNet were not in the best interests of shareholders and were not part of a concerted business plan or strategy. In truth, AMAX appears to have been acquired primarily because AMAX was secretly owned by defendant Tsao and his brother-in-law, Jerry Shih;

(b)     The AMAX acquisition was also not in the best interests of shareholders and was not part of a concerted business plan or strategy because the acquisition of AMAX – a tiny competitor in the super-competitive computer sales  market -- added little or nothing to the Company, except to create the appearance that Pegasus was growing;

(c)     The AMAX acquisition was *not* conducted at arm's-length among disinterested and non-related parties, but rather constituted an interested deal among friends and family;  the acquisition strategy was consistent with defendants' prior strategy for acquisition of assets - - such as CEO-channel.com - - that were also acquired from undisclosed "friends and family;"

(d)     Because it does not appear that defendant Knabb has any considerable assets, Knabb did not have the ability to "purchase" over 571,000 shares of Company stock and in connection with the CNet acquisition or to "purchase" over 222,000 shares of Pegasus stock - - then valued, in total, at almost $8.0 million - - to finance these acquisitions, despite defendants' representations that he had made such purchases;

(e)     The Company engaged in a series of transactions with parties that were not at arm's length or disinterested, and therefore, there is no reasonable basis to conclude that the value of these transactions was fair, accurate and reasonable, as reported.

46.     On January 19, 2006, Pegasus published another release announcing the acquisition of SKI Technologies, a Taiwanese-based manufacturer of electrical and wireless communications products.  This release stated, in part, the following:

**Pegasus Wireless Corporation Acquires SKI Technologies, Inc. in Taiwan for Manufacturing of Its Wireless Products; Third Acquisition Gives Pegasus the Capacity to Become Paramount Wireless Technology Provider**

Pegasus Wireless Corporation (OTCBB:PGWC), a leading provider of advanced wireless solutions, announced today the acquisition of SKI Technologies, Inc., a Taiwanese manufacturer of electronics and wireless communications products, for a combination of cash and stock. *The acquisition of SKI allows Pegasus to become a complete end-to-end solution provider to its customers: this acquisition in conjunction with the recent acquisitions of AMAX Engineering Corporation and CNet Technology, Inc. gives Pegasus the capacity to engineer, manufacture, and distribute its wireless products through its own channels, therefore eliminating the need for contract manufacturing from outside venues.*

**Jasper Knabb**, President of Pegasus Wireless Corporation, commented on the acquisition by stating, "*This is a huge step toward the successful execution of our business plan*, and we are thrilled to have the committed professionals at SKI on

board. SKI is dedicated to continually improving the manufacturing process by supplying the most competitive product at the lowest cost possible, and by selecting them as the element that concludes our strategic acquisitions, *we are confident that we can now focus one hundred percent of our efforts on the organic growth of Pegasus Wireless as a united entity."*

*While these planned acquisitions have culminated one portion of Pegasus Wireless Corporation's business plan, the Company is already looking forward to achieving their next goal*, which is to bring their products to the retail front. **Knabb** went on to say, "By targeting other acquisitions, we are now looking to brand our image as the premier wireless solutions provider and bring our products to the retail arena. *This is consistent with our never-ending goal of growth, and will increase our revenues substantially as well as maximize shareholder value.*" [Emphasis added.]

47.    The Company's January 19, 2006 release also described SKI, in part, as follows:

**About SKI Technologies, Inc.**

Established in 2001, *SKI Technologies, Inc. is an aggressive force in the wireless communication and electronics manufacturing arena. ...They have an advantage over their competition due to their specialized manufacturing ability and robust production experience, and are a driving force in the surrounding community.* [Emphasis added.]

48.    The statements made by defendants contained in the Company's January 19, 2006 press release were materially false and misleading and were know by defendants to be false at that time, or were deliberately disregarded as such, for the reasons stated herein in ¶ 36, *supra*.

49.    On March 3, 2006, Pegasus published a release announcing that the Company had realized $17.6 million in revenues for the six month period ended December 31, 2005.  This release stated, in part, the following:

**Pegasus Wireless Reported $17.6 Million in Profitable Revenue for the Six Month Transition Period Ended December 31, 2005**

*...AMAX was acquired to expand our distribution channels as well as leverage off their product lines.*

Pegasus acquired CNet Technology, Inc. and SKI Technologies, Inc. on December 29, 2005 and January 19, 2006, respectively. ... *CNet and SKI are primarily manufacturing companies which allow Pegasus to deliver its products to the market*

*in quantity and timeliness previously not available to the Company.*

*Pegasus reported $17.6 million in profitable revenue for the six month transition period ended December 31, 2005. ...*

**Jasper Knabb** said, "*We are pleased that our revenues came in at the expected levels. And we look forward to continually implementing our business plan.*" [Emphasis added.]

50.    On or about March 3, 2006, defendants filed with the SEC the Company's 2005 Form 10-KSB for the year ended December 31, 2005, signed and certified by defendants Knabb and Durland.  In addition to making statements that were substantially similar to those statements made by defendants previously concerning the Company's performance and its operations, the 2005 Form 10-KSB also contained statements that attested to the purported sufficiency and completeness of the Company's controls and procedures, as follows:

*[O]ur Chief Executive Officer and Chief Financial Officer (or persons performing similar functions) concluded that our disclosure controls and procedures are effective in timely alerting them to material information required to be included in our periodic reports that are filed with the Securities and Exchange Commission.... There have been no significant changes in the Company's internal controls or in other factors since the date of the Chief Executive Officer and Chief Financial Officer's (or persons performing similar functions) evaluation that could significantly affect these internal controls during the period covered by this report...* [Emphasis added.]

51.    The Company's 2005 Form 10-KSB also contained certifications by defendants Tsao and Durland that specifically attested to the purported accuracy and completeness of the Company's controls and procedures, including the following:

*Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

\*\*\*

*Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial*

*condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;*

\*\*\*

[Other certifying officers and I]:

> (a)    *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

> (b)    *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*

> (c)    *Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;*

\*\*\*

[Other certifying officers and I have disclosed]:

> (a)    *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and*

> (b)    *Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.*

52.    Defendants Tsao and Durland also signed certifications pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sabanes-Oxley Act of 2002 ("SOX Certification"), certifying, *inter alia*, that *"the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."* [Emphasis added].

53.    In addition to the foregoing, the 2005 Form 10-KSB also contained statements that purported to disclose the complete nature and extent of any transactions that had occurred between the Company, its executives and directors, and any related third-parties, as follows:

A    - **Facilities operating lease** - The Company leases it headquarters building from a majority stockholder. This lease calls for annual rent in the amount of $863,800.

B    - **Related companies** - The Companies record sales, accounts receivable, purchases, administrative expenses and accounts payable to and from 5 brother-sister related companies. ***None of these companies own any stock of the Companies, nor do the Companies have any investment in these related companies. They are related by virtue of similar/common control.*** [Emphasis added.]

54.    The statements made by defendants contained in the Company's March 3, 2006 press release and in Pegasus' 2005 Form 10-KSB, were materially false and misleading and were know by defendants to be false at that time, or were deliberately disregarded as such, for the reasons stated herein in ¶ 36, *supra*.  In addition, the statements concerning the Company's controls and procedures and the statements concerning the adequacy and sufficiency of defendants' disclosures were also materially false and misleading for the reasons stated herein in ¶ 36, *supra*.

55.    On March 10, 2006, Pegasus published a release announcing that it had signed a letter of intent to acquire the product line of MacControl, a Miami-based manufacturer of home entertainment system controllers and remote controls.   This release quoted defendant Knabb, as follows:

"***This is an extremely exciting way for Pegasus to begin branching out into the retail market.*** The ways that our streaming audio and video technologies can complement this already advanced system will allow our customers to control and manage content delivery within their homes like never before.... ***This acquisition will be the fourth for Pegasus in a one-year period, but the first that will couple another company's product with Pegasus' patented technology. This endeavor further solidifies the Company as the dominant force in an industry with ever-increasing demand.***" [Emphasis added.]

56.    The statements made by defendants contained in the Company's March 10, 2006 press release were materially false and misleading and were know by defendants to be false at that time, or were deliberately disregarded as such, for the reasons stated herein in ¶ 36, *supra*.

57.    On April 19, 2006, Pegasus published a release announcing that the Company had obtained approval to be listed for trading on the Nasdaq National Stock Market, under the symbol PGWC and that trading would commence April 21, 2006.  This release also quoted Knabb, as follows:

> *"The acceptance and approved listing of Pegasus Wireless to the NASDAQ National Market is a significant milestone in the development and future growth of our company. We are proud to have satisfied the strict standards of reporting and financial strength and viability required by the NASDAQ.* We believe our shareholders will greatly benefit from the advanced profile this listing provides and *we are now squarely focused on executing our strategies to further establish Pegasus as a true leader in the wireless solutions industry.*" [Emphasis added.]

58.    On May 8, 2006, Pegasus published a release announcing "record" results for the first quarter ended March 31, 2006.  This release stated, in part, the following:

--    **Company Showcases Dramatic Growth in Q1 2006**

**Pegasus Wireless Corporation (Nasdaq:PGWC), a leading provider of advanced wireless solutions, announced today the company's first quarter financial results for 2006:**

\*    **First Quarter Revenue reported at a record $23 million, a 40% increase from Q4 2005**

\*    **Gross Profit increased to $2.1 million, a 38.6% increase from Q4 2005**

\*    **Operating Expense reported at a 15% increase to $1.8 million from $1.5 million in Q4 2005**

\*    **Operating Income up to $300,000, jumping from a $40,000 loss in Q4 2005**

\*    **Net Income $200,000, a 200% increase from a $200,000 loss in Q4 2005**

\*    **Balance Sheet shows increase in Cash, Accounts Payable, Accounts Receivable, and Decrease in Accrued Expense**

\*\*\*

**Jasper Knabb**, President of Pegasus Wireless Corporation, said of the financials, "*We are extremely proud of our first quarter results, as the company has transitioned into an exciting new growth initiative with the acquisitions in late 2005*, and most recently, the move to the Nasdaq National Market. These *components of our business plan have proven to be profitable for Pegasus as well as its shareholders, and we can only look forward to a bright future as a company in a revolutionary industry.*" [Emphasis added.]

59.    The same day, May 8, 2006, defendants filed with the SEC the Company's 1Q:06 Form 10-QSB for the quarter ended March 31, 2006, signed and certified by defendants Tsao and Durland.  In addition to making statements that were substantially similar to those statements made by defendants previously concerning the Company's performance and its operations, the Company's 1Q:06 Form 10-QSB also contained statements which attested that the Company's controls and procedures "are effective."

60.    In addition to the foregoing, the 1Q:06 Form 10-QSB also contained the same statements that purported to disclose the complete nature and extent of any transactions that had occurred between the Company, its officers or directors, and any related third-parties and the Company that were included in the 2005 10-K, discussed at ¶ 44.

61.    The Company's 1Q:06 Form 10-QSB also contained SOX Certifications by defendants Tsao and Durland that specifically attested to the purported accuracy and completeness of the Company's controls and procedures

62.    As shares of the Company traded from a Class Period high of $18.99 per share on May 5, 2006, to below $6.75 per share on June 14, 2006, defendants took further aggressive and affirmative steps to re-inflate the price of Pegasus shares by publishing even more false and

misleading statements about the Company.  On June 16, 2006, *Dow Jones Newswire* reported that Knapp had publicly stated that Pegasus' two most recent acquisitions - - CNet Technologies and SKI Technologies - would foreseeably allow the Company to achieve revenues as high as $650 million in the foreseeable near-term.  In addition, according to the *Dow Jones* report, defendants also stated that Pegasus was ready to begin manufacturing at its newly acquired facilities and would have its WiJET.e wireless video presentation system available for sale by the end of the year.

63.     In an effort to further artificially inflate the price of Pegasus stock, on June 28, 2006, defendants announced that Knabb had purchased 1.25 million shares of Pegasus stock at $8.00 per share, in a private placement, valued at $10 million.  At that time, defendants stated that the proceeds of this offering were ***already*** committed to pay for acquisitions, hiring sales and marketing staff, and for operational costs.  At that time, defendants published a release that stated, in part, the following:

> *[T]he company has completed a private placement of its common stock that totals 10 million dollars. The Company's President, Jasper Knabb has purchased 1.25 million shares of Pegasus Wireless Corporation common stock at eight dollars per share, and plans to use the funds to continue the implementation of the Company's business plans.*

> *Net proceeds from the private placement will go towards pertinent aspects of the company's plan to establish and maintain Pegasus' position at the pinnacle of the wireless industry.* ... Knabb said of the private placement, *"I am proud to be a part of such a dedicated team, and feel very strongly about the company's ability to do great things with this funding. Pegasus plans to put the proceeds of this financing to immediate use, and I am thrilled to be able to facilitate the growth of such a powerful organization."* [Emphasis added.]

64.     The statements made by defendants contained in the Company's April 19, 2006, May 8, 2006, June 16, 2006 and June 28, 2006 press releases and those statements contained in its 1Q:06 Form 10-QSB were materially false and misleading and were know by defendants to be false at that time, or were deliberately disregarded as such, for the reasons stated herein in ¶ 36, *supra*.  In addition, these statements were also materially false and misleading because: (a) there was no

1  rational basis to claim that Pegasus would, or could, achieve revenues of $650 million in the

2  foreseeable near-term; and (b) if payment was ever made by defendant Knabb for the $10 million in

3  Pegasus stock referenced above, it was *not* fully committed at that time and it was *not* immediately

4  available to the Company.  In fact, as investors would ultimately learn, all Knabb provided the

5  Company for these shares was a "subscription receivable" and, later, almost $7 million in cash was

6

7  paid back to Knabb after the Company revealed that he had never even purchased the shares.

8      65.     On July 5, 2006, Pegasus was added to the influential Russell 2000 Index.[3]  That

9  day, defendants also published a release that quoted Knabb, as follows:

10     "*We are extremely proud to be added to this list of prominent companies, and are
       excited as to the implications that it holds for the future. Being recognized by
11     Russell is an honor and a privilege that we at Pegasus are prepared to uphold to the
       highest standards.*" [Emphasis added.]
12

13     66.     On July 20, 2006, Pegasus published a release announcing that Knabb would be

14  ringing the ceremonial opening bell at the Nasdaq.  This release quoted Knabb, as follows:

15

16     "It is a tremendous honor to be ringing the opening bell, and *a privilege to celebrate
       the success of Pegasus Wireless with an opportunity such as this,*" said Knabb of the
17     upcoming ceremony. "Since coming to the public arena, *we have enjoyed remarkable
       growth in size as well as in our technological capabilities and I would like to thank
18     our employees, customers and shareholders for their continued support of the
       Pegasus Wireless vision.*"  [Emphasis added.]
19

20     67.     On July 25, 2006, Pegasus published a release announcing purported "record"

21  setting results for the second quarter ended June 30, 2006.  This release stated, in part, the following:

22  **Pegasus Wireless Corporation Reports Second Quarter 2006 Financial Results;
    Company Demonstrates Extraordinary Growth With Record-High Revenue**
23

24  ...Pegasus Wireless is proud to report that revenue for the second quarter of 2006 was
    a Company *record* $25.4 million, representing a 10% revenue growth as compared to
25  the $23 million in revenue that was generated for the first quarter of 2006. Gross
    profit for the second quarter totaled $2.5 million, a 21% increase from the $2.1
26

27  ─────────
    [3] The Russell Index captures the 3,000 largest U.S. stocks and ranks them by total market
28  capitalization to create the Russell 3000 Index.  The largest 1,000 companies comprise the Russell
    1,000 Index, and the remaining companies become the widely used Russell 2000 Index.

million gross profit that was reported for the first quarter. The Company also reported a net profit increase of 8% over the first quarter of this year.

**Jasper Knabb**, President of Pegasus Wireless Corporation, commented, "*We are thrilled with our second quarter results, particularly the 10% quarter-over-quarter revenue growth. The financials for this quarter are a direct result of the organic growth that Pegasus has seen over the last three months*. During the quarter, we achieved many important milestones such as commencing trading on the Nasdaq, *showcasing ground-breaking products that will soon be available through our retail channels*, and streamlining our management structure to better fit the needs that were created by our recent expansions. *The growth that we have enjoyed this quarter has set a new standard for us here at Pegasus and we anticipate continuing on our record-setting pace, as we will soon be generating substantial revenue from retail sales of our innovations.*" [Emphasis added.]

68.    The same day, July 25, 2006, defendants filed with the SEC the Company's 2Q:06 Form 10-Q for the quarter ended June 30, 2006, signed and certified by defendants Knabb and Durland. In addition to making statements that were substantially similar to those statements made by defendants previously concerning the Company's performance and its operations, the Company's 2Q:06 Form 10-QSB also contained statements which attested that the Company's controls and procedures "are effective."

69.    The Company's 2Q:06 Form 10-QSB also contained Sox Certifications by defendants Knabb and Durland that specifically attested to the purported accuracy and completeness of the Company's controls and procedures

70.    On August 3, 2006, defendants published a release announcing Pegasus' purported "*commitment to corporate governance and compliance with Sarbanes-Oxley*." This release again quoted Knabb as follows:

"Due to their strategic relationship with the NASDAQ, we selected MetricStream's software solutions and ComplianceOnline.com as the foundation for all of our compliance initiatives. Regulatory compliance affects every aspect of our business, and we wanted to ensure that we have a mechanism to meet our immediate Sarbanes-Oxley 404 and ISO compliance requirements. This will also support future compliance initiatives in an integrated manner." [Emphasis added.]

71.    On August 4, 2006, defendants published a release announcing that the Company had retired 13 million shares of company stock, bringing the balance of issued and outstanding shares to 65.68 million.  This release again quoted defendant Knabb as follows:

> **Jasper Knabb**, President and CEO of Pegasus Wireless Corporation, commented, *"Shareholder value is of the utmost importance to us at Pegasus, and we are dedicated to ensuring that our shareholders get the most out of their investment in our company.* We have the ability to continue to retire shares of our common stock, and will do so in a strategic manner that will benefit our investors." [Emphasis added.]

72.    The same day, August 4, 2006, defendants also announced the issuance of a special dividend to shareholders of record as of August 11, 2006, whereby they:

> will be entitled to receive one common stock purchase warrant at a strike price of $8.00 for every ten shares of Pegasus Wireless common stock owned." .... Eligible shareholders will have 15 days from the above-mentioned date of record to receive their warrants. ... *Those shareholders who possess common stock certificates are required to physically present the certificate to Pegasus' transfer agent in order to receive their warrants. Shareholders whose common shares of Pegasus stock are held in a brokerage account must contact their brokerage firm to ensure that the warrants are processed correctly. Any beneficial stockholder who has difficulty with their brokerage house should email the Company at warrants@pgwc.com immediately.* [Emphasis added.]

73.    In addition to the foregoing, this release also quoted Knabb, as follows:

> *"We are issuing this dividend to demonstrate our long-term dedication to those shareholders that have remained loyal and committed to Pegasus, and I trust that every eligible shareholder will enjoy the benefits of the dividend."* [Emphasis added.]

74.    The statements made by defendants contained in the Company's July 20, 2006, July 25, 2006, August 3, 2006 and August 4, 2006 press releases and those statements contained in its 2Q:06 Form 10-QSB were materially false and misleading and were know by defendants to be false at that time, or were deliberately disregarded as such, for the reasons stated herein in ¶ 36, *supra.*  The statements made by defendants were also materially false and misleading because the "share dividend" was not offered to reward the long-suffering shareholders of the Company, but

rather constituted an ill-conceived scheme to further manipulate the price of Pegasus stock by eliminating phantom "short-sellers," who Knabb repeatedly but baselessly claimed had sold stock in the Company that did not exist (commonly referred to as "naked shorts.")

75.      Thus, despite the fact that no accepted evidence exists to support Knabb's theory that Pegasus shares were oversold by tens of millions of shares, and despite evidence that supports the proposition that managers who lose focus over their business and chose to pursue phantom causes - - such as naked short sellers - - tend to underperform the market, defendant Knabb engineered this manipulative offering.  The offering resulted in a loss of corporate focus and waste of corporate assets, and, as investors ultimately learned, this offering did little or nothing to reduce the justifiably large short-interest in Pegasus stock.

76.      On August 14, 2006, the Company published a release announcing that defendants had acquired another "innovative" product line from MacControl, LLC, for stock consideration then valued at almost $5.0 million.  This release stated, in part, the following:

> *The acquisition was funded by the issuance of 833,333 restricted shares of Pegasus Wireless Corporation stock to maccontrol. The product line that Pegasus has acquired from maccontrol is to be used in conjunction with the Company's recently introduced solution, wirelesscables. The maccontrol line features a remote and a connector that will complement the ease of use that wirelesscables offers by controlling all components of the home entertainment system with one remote.*

> *"We are thrilled to be taking on the maccontrol line as a Pegasus venture,"* said Jasper Knabb, President and CEO of Pegasus Wireless Corporation. "We are placing a huge emphasis on the retail consumer with our home entertainment solutions; and *by combining our technology with the advanced applications that the maccontrol products have to offer, Pegasus will establish an entirely new level of wireless technology that can be used in the home."*  [Emphasis added.]

77.      The statements made by defendants contained in the Company's August 14, 2006 press release were materially false and misleading and were know by defendants to be false at that time, or were deliberately disregarded as such, for the reasons stated herein in ¶ 36, *supra*.

## THE TRUE FACTS BEGIN TO EMERGE

78.     Beginning in late-August, the truth about the Company began to be revealed to investors.  On August 24, 2006, investors were shocked and alarmed by a report published by *The MotleyFool.com*, entitled *"Don't Bet on This Horse."*  This report portrayed Knabb as a serial penny stock manipulator and stated, in part, the following:

> *In Pegasus' filings, of course, Knabb is portrayed as a successful tech businessman, but I think the record of his last publicly traded enterprise, Wireless Frontier Internet, proves otherwise.* At this company…Knabb was president and director…The story at Wireless Frontier was rolling up rural Internet service providers. The company bought more than a dozen of them. But what rolled up for shareholders, mostly, were losses.

> But not before the stock soared, helped along (I have no doubt) by the usual types of penny-stock pumps. (The latter, by the way, looks like it came from a Florida stock tout who had already been nailed by the SEC for fraudulently promoting a stock, working directly with the president of the company.)

> I've seen nothing to indicate Knabb had any direct relationship to any of this paid touting -- although believe me, I'm continuing to dig. *But then, Knabb did plenty of PR of his own, such as proclaiming his company to be "quickly emerging as the leading resource of wireless broadband Internet," touting Wireless Frontier's application to list on the Amex, and splitting the sub-two-dollar stock in early 2004.*

> *But in reality, Wireless Frontier was not really doing so hot.* Its 10-K from the period shows a balance sheet loaded up with goodwill and a couple years of losses. The cash burn was even less impressive. *The 10-Q corresponding directly to the period of Knabb's early 2004 enthusiasm shows a widening loss. The stock kept cratering, and by October, only half a year after the (in)glorious run-up, Knabb had resigned. … In August 2005, judgments were being entered against the firm, resulting in forced auction of assets.* [Emphasis added.]

79.     The August 24, 2006 *MotleyFool.com* report also exposed the myriad of undisclosed related party transactions between the Company and parties with current or former associations to Knabb.   In this regard, the report stated the following:

**The friends and family plan**

One thing that has always disturbed me about Pegasus is the acquisition binge. If the company has such great wireless technologies, why would it need to diversify into other businesses? (*Remember the fate of Knabb's last wireless acquisition machine.*)

*But things look even odder when you look at some of the details in these acquisitions.*

In December 2005, the company paid $8 million (half cash, half stock) for a 51% interest in two California computer sales and service companies called AMAX Engineering and AMAX Information Technologies. *If you're wondering why a company trying to position itself as a Wireless developer and manufacturer would be interested in a pair of businesses in the cutthroat computer-hawking market, so am I.*

*Perhaps this has something to do with it? AMAX was owned by Jerry Shih, brother in-law to Pegasus founding CEO Alex Tsao. Are we to believe that shareholders are well served when companies are buying from their inlaws?* I've got my doubts.

But family members aren't the only ones who seem to be getting in on the game. *Friends and associates -- some with absolutely worthless businesses -- are fair game, too. Why else would Pegasus have agreed to acquire CEO-channel.com on April, 4, 2005, for 3 million shares of stock* (worth about $0.25 each at that time, according to the historical prices at Yahoo!)?

Whole lotta nothin'

*What did Pegasus get for that $750,000 worth of stock? Close to nothing.* Wait, less than nothing. As of the 10-K filed on April 6, 2005, only two days after that acquisition announcement, *CEO-channel.com had $15,000 in cash but $18,200 in liabilities.* Take a look for yourself. *The company didn't even have an operating business,* seriously.

So, why the buy? Who knows. *As far as I've seen, it wasn't explained in any of Pegasus' later 10-Ks or noted in a press release at the time.* Pegasus shareholders, however, might be interested to know **that CEO-channel's owner, Lawrence Creeger, the majority owner, sole director, and officer, just happened to be involved (since at least 2003) with Pegasus CFO Stephan Durland in a venture called Global Event Makers,** formerly "Pro Celebrity Caribbean Tour Inc.," and another called Global Equity, formerly "Eventmakers-Caribbean Corp." [Emphasis added.]

80.    The August 24, 2006 *MotleyFool.com* report (the "*MF* Report") into defendant Durland did not stop there.  The *MF* Report also exposed a host of undisclosed material adverse information about defendant Durland, including a history of involvement with failed and suspect ventures, such as that he was CFO and then acting CEO of a company called Medical Makeover Corporation of America, which appears to have shared an office with DP Martin and Associates, which paid penny-stock promoters to "fluff" Medical Makeover's shares.    Both firms were represented by an attorney named Donald Mintmire, who was "disbarred following a federal conviction on obstruction related to a Florida pump and dump scheme."

81.    Specifically, the August 24, 2006 *MF* Report also noted with respect to Durland:

While we're here, *let's take a deeper look at CFO Durland's past*. You can't argue that he doesn't know the ground. He's been with Pegasus -- at least the flop predecessor, Blue Industries - - since his firm was hired as auditor in March of 2003.

\*   \*   \*

Kind of makes you wonder what sort of delights you'd find by skimming the history of the firms where Durland has been a director or CFO, no?

Knock yourself out. There are plenty in the 10-K, which you can get here. There are some real winners in the crowd - - and by winners, I mean losers. How about Safe Technologies International? Or - - this is a hoot - - a company that was going to make waves salvaging sunken World War I and II-era boats, Ocean Resources? American Ammunition, anyone? If you're hungrier, the 10-K left out a few of Durland's other prior affiliations: ElectraCapital, for instance, and Diversified Product Inspections.

*But to me, the most interesting -- and by interesting, I mean horrifying -- has got to be Medical Makeover Corporation of America, a penny stock Durland was involved with from June 2004*, and whose business is described in its latest 10-K as follows: "With the failure of the Company's last two business plans, it has reverted to the development stage. Management is currently evaluating several opportunities." *Durland was a director, then acting CEO, until July of this year*.

I'm not surprised he finally fled this disaster; after all, we're talking about a company that pretty much does nothing, by its own admission. It reports no cash and no revenues, and one employee. *This is what Durland took public? No wonder the share price has cratered since the reverse merger he is credited with orchestrating*.

Not that there weren't penny-stock hypesters out trying to keep Medical Makeover floating. For instance, take a look at this March 1, 2005 "alert" on the company. Note that the fine print discloses it's a paid pump job: *Some outfit called DP Martin and Associates shelled out $20,000 to get this load of tripe sent out*.

*Who is DP Martin and Associates*? That's not entirely clear to me yet, but maybe Durland could fill us all in. After all, it appears they may have been neighbors, or even *shared the same office*.

*Florida business records show a DP Martin and Associates located at 500 Australian Avenue, No. 619, West Palm Beach, Fla., an address that just happens to look like the same one address occupied by Medical Makeover's predecessor company, Cactus New Media*. Strangely enough, they seem to have changed their addresses to that office within a week of each other. (Medical Makeover's current address is listed in the same building, but in No. 700.)

*Finally, … the firms also share the same registered agent, an attorney named Donald Mintmire who was disbarred following a federal conviction on obstruction related to a Florida pump and dump scheme….Something smells here, people, and it's not the West Palm Beach breeze.*

82.    The revelation of these adverse facts and circumstances caused shares of the Company to immediately decline. On August 24, 2006, Pegasus stock plummeted - - falling from a closing price of $7.60 per share on August 22, 2006, only two trading days before the *MF* Report was widely circulated, to a close of $5.82 per share on August 24, 2006. Thus, within only two trading days, shares of the Company declined almost 25% on high volume of almost 2 million shares traded over that period.

83.    Following the *MF* Report, on August 28, 2006, *The New York Post* published a story about the Company titled "*Horse Feathers*." This report expanded on the issues exposed previously by the *MF* Report and stated, in part, the following:

*OVER the years this one time Vancouver- based penny stock has accumulated one of the most convoluted and confusing corporate pedigrees imaginable* - including two reverse mergers as well as a failed attempt at a third reverse merger.

Much of the action revolves around the firm's CEO - an attention-hungry self-

promoter from South Carolina named Jasper Knabb, who once appeared as an extra in an episode of "CSI: Miami."

In 1998 Knabb set out to make a name for himself in the red-hot dot-com space, launching a small scale Internet service provider called Beach Access, buying what he needed for the enterprise from an obscure West Coast supplier called OTC Telecom.

Knabb claimed Beach Access could provide connection services that ran 100 times faster than rivals. *But the business never got off the ground and in early 2000 he sold it to Biofiltration Systems, a Florida-based penny-stock concern.*

*Biofiltration had no business operations or revenues of its own at the time,* so to stir some interest in itself as a stock play, the company had already hired a convicted sex offender named Orville Baldridge to pump up its stock on the Over The Counter market.

Thinking he saw an opportunity for himself in the run-up that followed, Knabb offered to swap ownership of Beach Access for 12 million shares of Biofiltration stock, agreeing to stay on as head of what would now become a Biofiltration subsidiary.

*Yet not many months passed before Biofiltration fired Knabb and sued him to recover those shares, claiming Knabb was full of bull about Beach Access and had actually never owned the operation to begin with.*

*The court agreed with about half of what Biofiltration claimed, and ruled it had the right to fire Knabb but not to force him to hand back his stock. Next, Biofiltration collapsed and in 2003 the Securities and Exchange Commission delisted its shares.*

Unfazed by his firing, Knabb landed on his feet with a new job as an aide to the top man at OTC Telecom, **Alex Tsao**, who had recently changed the company's name to **OTC Wireless** to reflect the boom in orders that he had been expecting to receive from Knabb and Beach Access.

The orders, of course, failed to materialize and before long *Knabb and Tsao began looking elsewhere for opportunities, hooking up finally in late 2004 with what looked to be their meal ticket - a defunct Florida-based penny-stock outfit called Homeskills.*

*In early November 2004, OTC Wireless and Homeskills merged in a share exchange and began trading on the Over The Counter market under the name of Pegasus Wireless.*

The name change reflected the arrival of a new player: a London-based Greek shipowner named Nicos Peraticos, who serves as Pegasus' chairman of the board.

*The company's SEC filings describe Peraticos as head of a London shipping firm called Pegasus Ocean Services, LTD. Yet that is hardly the whole story.*

U.K. corporate records show the Pegasus [Ocean Services, LTD.] operation to be bankrupt and in liquidation, while *sources in the closely knit Greek shipping community say Pegasus [Ocean Services, LTD.] has been out of business for years.*

British shipping industry trade publications place the blame for Pegasus [Ocean Services, LTD.]'s demise squarely on Peraticos himself.

Hoping to expand the family business, he had issued $150 million in late 1990s junk bonds to a consortium of lenders that included Lazard Freres and Merrill Lynch, then ruinously poured the money into a fleet of aging rust-bucket oil tankers, leading to the collapse of the business.

*None of these things are even hinted at in Pegasus Wireless' SEC filings. And neither is there a coherent discussion of the company's allegedly cutting-edge technology.* [Emphasis added.]

84.    The following day, August 29, 2006, Asensio Capital Management in New York, published a report on its Internet website titled, "*Yet Another PGWC Fraud-Laden Shareholder*," that exposed the history of fraud and market manipulation linked to another of the Company's investors, identified in Pegasus' SEC filings as Wire To Wire Inc. - - the former officers of which were found liable for civil fraud by the SEC.    The Asensio Capital report stated, in part, the following:

*A July 25, 2006 Form 144 filing reported a planned sale of 10,000 shares of Pegasus Wireless Corporation by Wire To Wire, Inc ("Wire"). In 1999, Wire was implicated in, and subsequently Wire's former officers were found liable for fraud in a Wire-related entity, in a civil case brought forth by the Securities and Exchange Commission* ("SEC").

On September 28, 1999, the SEC filed a complaint against Gerald H. Levine, Marie A. Levine, and CEC Industries Corporation ("CEC"). The complaint charged the Levines and CEC with fraud violation, falsifying books and records, and accounting violations during fiscal years ending on March 31, 1996 and March 31, 1997.

***

CEC settled the SEC's financial fraud charges without admitting or denying the allegations, and on September 11, 2001 accepted a permanent injunction barring CEC from violating certain antifraud, record-keeping and internal control provisions. Subsequent to an acquisition in August 2004, CEC changed its name to Advantage Capital Development Corp. (OTHER OTC: AVCP $0.01). On October 16, 2003, Gerald and Marie Levine were found liable for financial fraud by a jury in the US District Court of the District of Columbia ("D.C.").

\*   \*   \*

**Gerald and Marie Levine are just the latest piece in the puzzle of fraud and deception surrounding PGWC, joining the company of felonious attorney Donald Mintmire and accused Taiwanese embezzler Hung Chiu-Hu.** [Emphasis added.]

85.     Friday, September 1, 2006, is the final day of the Class Period.  The weekend following that Friday was Labor Day weekend, and the markets were closed for trading on Monday, September 4, 2006.  Over that long weekend, however, leading financial media outlet *Barron's* published a very widely-circulated report about Pegasus that raised additional questions as to where Knabb received the funds to reportedly buy tens of millions of dollars of Company stock and *reported that Knabb had previously been arrested for possible insurance fraud.*  The *Barron's* report stated, in part, the following:

> **SEC filings by Pegasus show that Knabb has purchased about $18 million of Pegasus stock this year, even though he doesn't draw a salary from Pegasus, values of houses in the South Carolina area he lists as his home typically are lower than $350,000 and he's had some history of financial difficulty.**
>
> **In 1990, his first company, Software Exchange, filed for bankruptcy in North Carolina. Later, Knabb's boat was repossessed after John Weible, a self-described Myrtle Beach, S.C., mortgage lender, sued him in U.S. District Court of South Carolina for nonrepayment of a loan. ...**
>
> **During this period, Knabb was arrested for possible insurance fraud, according to police in North Myrtle Beach, though the case eventually was dropped.** [Emphasis added.]

86.     In addition to the foregoing, the *Barron's* report also highlighted the fact that, in the past, shares of two Knabb companies — BIFS Technologies, formerly Biofiltration Systems, and

1    Wireless Frontier — ballooned, then collapsed - - evidencing suspected stock and market

2    manipulation.    *Barron's* also questioned the veracity and completeness of defendants' statements

3    concerning the novelty and uniqueness of the Company's products and Pegasus' foreseeability to

4    compete in the current marketplace.

5
6        87.        Also over that weekend, on September 3, 2006, Defendant Durland's ties to Donald

7    Mintmire, the attorney that Asensio Capital labeled "felonious," were also exposed in another

8    Asensio Capital report that was posted on the Yahoo.com Pegasus message board.  This report

9    stated, in part, the following:

10       *Twenty-seven companies that have been audited by Durland & Company, CPAs, a*
         *firm run by Stephen Durland, who is Pegasus Wireless Corporation's Chief*
11       *Financial Officer ("CFO") and whose company served as PGWC's former auditor,*
         *have also been legally represented by convicted felon Donald F. Mintmire, Esq., or*
12       *his law firm, Mintmire & Associates.*

13       *Mr. Durland also served as a CFO, a Director, or a Chief Executive Officer in 6*
14       *firms that were represented by Mintmire & Associates....*

15       Mr. Durland has had regulatory brushes of his own. He lost his CPA license in the
         State of North Carolina and his firm was cited by the Public Accountancy Oversight
16       Board for failure in the Review of Audit Engagements.

17       *In 2005 Mr. Mintmire was found guilty of obstruction of justice in a federal grand*
18       *jury investigation and also of conspiracy to obstruct justice in an SEC probe, for*
         *concealing documents from the SEC regarding one of his shell companies.*
19
         *Mr. Mintmire was sentenced to 21 months in federal prison and an $80,000 fine,*
20       *and was prohibited from engaging in any business that offers securities,*
21       *investments or business opportunities. He was also disbarred from The Florida*
         *Bar. Mr. Mintmire was to report to prison on May 30, 2006,* but is currently out on
22       bond, pending appeal.  [Emphasis added.]

23
24       88.        The same day, September 3, 2006, the same Pegasus Yahoo.com message-board

25    user also posted another Asensio report titled, *"PGWC Links To The Corporate Scandal of the*

26    *Century."*  This report documented the relationship of Pegasus and Knabb to a notorious Taiwanese

27    stock manipulator named Hung Chiu-Hu, and to one of the Company's major investors, Vision 2000

28    Ventures, run by Chiu-Hu.  This report stated, in part, the following:

*"PGWC's Links To The "Corporate Scandal Of The Century."*

*…   The shareholding company is the same company that owns an interest in a Pegasus subsidiary, and which had dealings with PGWC's President and newly announced Co-CEO, Jasper Knabb, since at least 2001 The Taiwanese connection continues with PGWC's involvement with a Taiwanese national who stands accused of using over 100 bogus companies to embezzle in excess of $525 million from three different companies and who is a director of one of Pegasus' major shareholders.* Mr. Knabb has seen legal and financial controversies of his own.

According to Securities and Exchange Commission filings, *Vision 2000 Ventures, Ltd ("Vision") owns approximately 13% of PGWC. Vision is a Taiwanese based corporation also incorporated in the Cayman Islands whose director is Taiwanese citizen Hung Chiu-Hu.*

*Mr. Hu was arrested on May 18, 2005 for his involvement in what is notoriously referred to by the Taiwanese press as the "corporate scandal of the century.*"

*Mr. Hu was arrested, along with two co-conspirators, in connection with the embezzlement of over $456 million from the Taiwan-based Pacific Electric Wire and Cable, Co. Ltd* ("Pacific Electric").

*…According to the Taipei Times, during the investigation of the Pacific Electric, investigators also found evidence that Mr. Hu had embezzled in excess of $68 million from two more Taiwanese companies where he had served as a board member.*

As of July, 2005 Mr. Hu was awaiting trial and prosecutors were seeking a 20 plus year jail term.

The ties between Mr. Hu and Mr. Knabb existed prior to Vision acquiring shares of PGWC. Mr. ***Knabb's dealings with Mr. Hu goes back at least to 2001, when both were involved in OTC Wireless ("OTC")***.

*Vision's PGWC stock holding resulted from Pegasus' acquisition of OTC in November, 2004. Mr. Knabb served as OTC's Managing Director from 2001-2002.* [Emphasis added.]

89.     Following the first day of trading after the publication of the widely-circulated *Barron's* report, on September 5, 2006, shares of Pegasus again plummeted - - falling over 36.5% on huge volume of over 17.9 million shares traded.    Investors speculated that shares would have fallen more, except that many traders had *already* liquidated their shares on August 31 and September 1, 2006, as Pegasus shares were removed from the Russell 2000.  On August 30, 2006, shares of the Company closed at $5.15 per share.  Thereafter, as index traders liquidated their Pegasus shares, the

1    stock traded to $3.43 per share on August 31, 2006, and then to $2.38 the next trading day.

2    Following the publication of the *Barron's* report, on September 5, 2006, Pegasus shares closed at an

3    anemic $1.51 per share - - a new 52-week trading low.

4        90.     By September 20, 2006, shares of the Company traded just over $1.00 each.   That

5    day, defendants published a release that revealed that Pegasus Board of Directors had "decided to

6    amend" the previously announced sale of shares of common stock to defendant Knabb.   ***The

7    Company stated that it would return to Knabb almost $7 million that was previously reported to***

8    ***have been paid to Knabb by Pegasus to cover the cost of the sale*** of these shares to Knabb.   This

9    release stated, in part, the following:

10

11       FREMONT, Calif.--(BUSINESS WIRE)--Sept. 20, 2006--Pegasus Wireless
         Corporation (Nasdaq:PGWC - News), a leading provider of advanced wireless
12       solutions, *today announced that the Company has decided to amend a previously*
         *announced sale of shares of common stock to its Chief Executive Officer Jasper*
13       *Knabb.* The decision was approved today by the Pegasus Wireless board of directors,
         with Mr. Knabb abstaining from the vote.
14

15       *In June 2006, Mr. Knabb agreed to purchase shares of Pegasus Wireless*
         *Corporation common stock in a private placement totaling $10 million. In*
16       *connection with the sale, Mr. Knabb placed $10 million in an escrow account. The*
         *agreement provided that the shares would be sold at the trading price as the*
17       *Company withdrew funds from the escrow account.* At the time of the
         announcement, the Company was contemplating a strategic transaction that required
18       much of the $10 million from the stock sale. The Company was unable to come to
         terms on that transaction, decreasing the capital required by the Company.
19

20       The Company sold 379,625 shares of common stock at $8 per share for an aggregate
         of $3.04 million to Mr. Knabb, who is restricted from selling those shares for five
21       years. The balance of the private placement has been cancelled by agreement between
         the Company and Mr. Knabb. Among other things, those funds were used to hire
22       sales and marketing staff. *The remaining $6.96 million in the escrow account is*
         *being returned to Mr. Knabb.*
23

24       *Since May 2005 Mr. Knabb has invested more than $16.5 million in the Company*
         *including more than $12 million in placements and more than $4.5 million in the*
25       *open market for shares. He currently holds 3,969,056 shares.* [Emphasis added.]

26

27        91.     Despite the Company's willingness to give Knapp almost $7 million in cash, *it*

28   *does not appear that Pegasus received any consideration for this valuable concession.* In addition,

a review of the Company's 2Q:06 Form 10-QSB, filed with the SEC on or about July 25, 2006, appears to show that Knabb had never even paid the original $10 million - - the majority of which the Company now claims it is "returning" to Knabb.  As evidence of this, the Company's 2Q:06 Form 10-QSB stated, in part, that:

> On June 28, 2006, *the Company issued 1,250,000 shares of restricted common stock to the President of the Company in exchange for $10,000,000 in cash <u>subscription receivable</u>, valued at $8.00 per share*. On June 28, 2006, the President and CFO of the Company exercised their options, (granted in June 2004), for shares amounting to 1,200,000 and 1,080,000, respectively. The cash exercise price of these options was $0.325 per share, for a total of $390,000 and $351,000, respectively.  [Emphasis added.]

92.     Within days, Pegasus shares would be trading even lower after the Company announced on September 25, 2006, after defendants would voluntarily remove Pegasus from the Nasdaq Market Exchange.  While Knabb described this move as being in the "best interests" of the Company's shareholders, analysts were not convinced, stating, "why Knabb, or anyone else for that matter, believes that moving the stock to a less liquid market can possibly help with volatility is beyond comprehension."

93.     Throughout the Class Period, the market for Pegasus' common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Pegasus common stock traded at artificially-inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Pegasus common stock relying upon the integrity of the market price of Pegasus common stock and market information relating to Pegasus, and have been damaged thereby.

94.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Pegasus common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that

1    they failed to disclose material adverse information and misrepresented the truth about the Company,

2    its business and operations, as alleged herein.

3         95.    At all relevant times, the material misrepresentations and omissions particularized

4    in this Complaint directly or proximately caused or were a substantial contributing cause of the

5    damages sustained by plaintiff and other members of the Class. As described herein, during the

6    Class Period, defendants made or caused to be made a series of materially false or misleading

7    statements about Pegasus' business, prospects and operations. These material misstatements and

8    omissions had the cause and effect of creating in the market an unrealistically positive assessment of

9    Pegasus and its business, prospects and operations, thus causing the Company's common stock to be

10   overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading

11   statements during the Class Period resulted in plaintiff and other members of the Class purchasing

12   the Company's common stock at artificially-inflated prices, thus causing the damages complained of

13   herein.

14

15

16                              **CAUSATION AND ECONOMIC LOSS**

17        96.    During the Class Period, as detailed herein, defendants engaged in a scheme to

18   deceive the market, and a course of conduct that artificially inflated Pegasus' stock price and

19   operated as a fraud or deceit on Class Period purchasers of Pegasus' stock by misrepresenting the

20   Company's business, operations, management and the intrinsic value of Pegasus stock. Over a

21   period of approximately nine months, defendants purposefully issued materially false and misleading

22   statements about the Company and omitted to disclose material information necessary to make

23   defendants' statements true and accurate. Ultimately, however, when defendants' prior

24   misrepresentations and fraudulent conduct came to be revealed to investors, the price of Pegasus

25   stock declined precipitously - - evidence that the prior artificial inflation in the price of Pegasus

26   shares was eradicated. As a result of their purchases of Pegasus' stock during the Class Period,

27

28

1    plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal

2    securities laws.

3        97.    By improperly characterizing the Company and its officers and directors, and by

4    omitting to disclose the true histories and relationships to the third parties associated with or related

5    to the Company and by misrepresenting the Company prospects, defendants presented a materially

6    false and misleading image of Pegasus' business and future growth prospects.  During the Class

7    Period, defendants repeatedly emphasized the ability of the Company to increase revenues through

8    organic and acquired growth, and consistently reported results within or above the range of guidance

9    sponsored or endorsed by the Company.  These claims caused and maintained the artificial inflation

10   in Pegasus' stock price throughout the Class Period and until the truth about the Company was

11   ultimately revealed to investors.

12       98.    It was only beginning in late-August and early-September 2006 that investors

13   began to learn the truth about the Company after a string of shocking research reports surfaced in the

14   market.  Following the publication of this first report, on August 24, 2006, shares declined almost

15   25% from its recent trading levels.  Later, on September 1, 2006, following the publication of a

16   highly-critical, widely-circulated Barron's report, Pegasus shares collapsed to a trading low of $1.10

17   per share, on enormous volume of almost 18 million shares traded.  This dramatic share price decline

18   eliminated much of the artificial inflation from Pegasus' share price, causing real economic loss to

19   investors who purchased this stock during the Class Period.

20       99.    In sum, as the truth about defendants' fraud and illegal course of conduct became

21   known to investors, and as the artificial inflation in the price of Pegasus shares was eliminated,

22   plaintiff and the other members of the Class were damaged, suffering an economic loss of at least

23   several dollars and as much as $18.00 per share.

24       100.   The decline in Pegasus' stock price at the end of the Class Period was a direct result

25   of the nature and extend of defendants' fraud being revealed to investors and to the market.  The

timing and magnitude of Pegasus' stock price decline negates any inference that the losses suffered

by plaintiff and the other members of the Class were caused by changed market conditions,

macroeconomic or industry factors or even Company-specific facts unrelated to defendants'

fraudulent conduct.  During the same period in which Pegasus' share price fell over 80% as a result

of defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively

unchanged.

101.    The economic loss, *i.e.* damages suffered by plaintiff and other members of the

Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Pegasus

stock and the subsequent significant decline in the value of the Company's shares when defendants'

prior misstatements and omissions and other fraudulent conduct was revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

102.    As alleged herein, defendants acted with scienter in that each defendant knew that

the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in

the issuance or dissemination of such statements or documents as primary violations of the federal

securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of

information reflecting the true facts regarding Pegasus, their control over, and/or receipt and/or

modification of Pegasus' allegedly materially misleading misstatements and/or their associations

with the Company which made them privy to confidential proprietary information concerning

Pegasus, participated in the fraudulent scheme alleged herein.

103.    Defendants were motivated to materially misrepresent to investors the true financial

condition of the Company because by deceiving the investing public regarding Pegasus' business,

operations, management and the intrinsic value of Pegasus common stock, defendants were able to

1    negotiate the acquisitions of several other smaller companies, often using Company stock as partial

2    consideration, while in possession of material adverse non-public information about Pegasus.

3    Defendants were also able to secure millions of dollars in payments to Knabb by the Company in

4    exchange for no apparent valuable consideration by purporting to reimburse Knabb for payments

5    made that had in fact not been made.  By engaging in this scheme, defendants were also able to

6    make deals to benefit their close friends and family at the expense of the Company and its

7    shareholders.

8    

9            104.     In addition to the foregoing, false statements and omissions related to the purported

10   purchase of Company shares by defendant Knabb is further evidence of defendants' scienter.  The

11   uncertain and suspicious financial condition of defendant Knabb as well as his failure to disclose the

12   source of funds used to purchase $26 million in Pegasus stock, and other statements concerning the

13   actual legitimacy of those purchases - - which now appear, in substantial part, not to have occurred -

14   - are evidence of defendants' acting with knowledge or with deliberate disregard for the truth about

15   Pegasus.     As defendants have now essentially conceded, at all times during the Class Period,

16   defendants knew and/or deliberately disregarded Knabb could not and did not purchase $10 million

17   of company stock for payment of cash, or anything of value.

18   

19                   **Applicability Of Presumption Of Reliance:**
                     **Fraud-On-The-Market Doctrine**

20   

21           105.     At all relevant times, the market for Pegasus common stock was an efficient market

22   for the following reasons, among others:

23                   A.     Pegasus stock met the requirements for listing, and was listed and actively

24   traded on the Nasdaq national market exchange, a highly efficient and automated market;

25                   B.     As a regulated issuer, Pegasus filed periodic public reports with the SEC and

26   the Nasdaq;

27   

28

C.    Pegasus regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.    Pegasus was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

106.    As a result of the foregoing, the market for Pegasus securities promptly digested current information regarding Pegasus from all publicly-available sources and reflected such information in Pegasus stock price. Under these circumstances, all purchasers of Pegasus common stock during the Class Period suffered similar injury through their purchase of Pegasus common stock at artificially-inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

107.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was

1    false, and/or the forward-looking statement was authorized and/or approved by an executive officer

2    of Pegasus who knew that those statements were false when made.

### BASIS OF ALLEGATIONS

108.    Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by Pegasus, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### FIRST CLAIM

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants**

109.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

110.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and did, throughout the Class Period: (i) deceive the investing public regarding Pegasus' business, operations, management and the intrinsic value of Pegasus common stock; (ii) enable defendants to negotiate the acquisitions of several other smaller companies, often using Company stock as partial consideration, while in possession of material adverse non-public information about Pegasus; and (iii) cause plaintiff and other members of the Class to purchase Pegasus common stock at artificially-inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

111.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Pegasus' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

112.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Pegasus as specified herein.

113.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Pegasus' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Pegasus and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Pegasus common stock during the Class Period.

114.    Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and

1   participated in the creation, development and reporting of the Company's internal budgets, plans,

2   projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and

3   familiarity with the other defendants and was advised of and had access to other members of the

4   Company's management team, internal reports and other data and information about the Company's

5   finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of

6   the Company's dissemination of information to the investing public which they knew or deliberately

7   disregarded was materially false and misleading.

8

9       115.    The defendants had actual knowledge of the misrepresentations and omissions of

10  material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to

11  ascertain and to disclose such facts.  Such defendants' material misrepresentations and/or omissions

12  were done knowingly or with deliberately for the purpose and effect of concealing Pegasus'

13  operating condition and future business prospects from the investing public and supporting the

14  artificially-inflated price of its common stock.  As demonstrated by defendants' overstatements and

15  misstatements of the Company's business, operations and earnings throughout the Class Period,

16  defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged,

17  were deliberate in failing to obtain such knowledge by deliberately refraining from taking those steps

18  necessary to discover whether those statements were false or misleading.

19

20      116.    As a result of the dissemination of the materially false and misleading information

21  and failure to disclose material facts, as set forth above, the market price of Pegasus common stock

22  was artificially inflated during the Class Period.  In ignorance of the fact that market prices of

23  Pegasus' publicly-traded common stock were artificially inflated, and relying directly or indirectly

24  on the false and misleading statements made by defendants, or upon the integrity of the market in

25  which the securities trade, and/or on the absence of material adverse information that was known to

26  or deliberately disregarded by defendants but not disclosed in public statements by defendants

27

28

1     during the Class Period, plaintiff and the other members of the Class acquired Pegasus common

2     stock during the Class Period at artificially-high prices and were damaged thereby.

3          117.     At the time of said misrepresentations and omissions, plaintiff and other members

4     of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other

5     members of the Class and the marketplace known the truth about Pegasus that were not disclosed by

6     defendants, plaintiff and other members of the Class would not have purchased or otherwise

7     acquired their Pegasus common stock, or, if they had acquired such common stock during the Class

8

9     Period, they would not have done so at the artificially-inflated prices which they paid.

10         118.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange

11     Act, and Rule 10b-5 promulgated thereunder.

12         119.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the

13     other members of the Class suffered damages in connection with their respective purchases and sales

14     of the Company's common stock during the Class Period.

15

16                             **SECOND CLAIM**

17                           **Violation Of Section 20(a) Of**

18          **The Exchange Act Against Individual Defendants**

19         120.     Plaintiff repeats and realleges each and every allegation contained above as if fully

20     set forth herein.

21         121.     The Individual Defendants acted as controlling persons of Pegasus within the

22     meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

23     positions, and their ownership and contractual rights, participation in and/or awareness of the

24     Company's operations and/or intimate knowledge of the false financial statements filed by the

25     Company with the SEC and disseminated to the investing public, the Individual Defendants had the

26

27     power to influence and control and did influence and control, directly or indirectly, the decision-

28     making of the Company, including the content and dissemination of the various statements which

plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

122.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

123.    As set forth above, Pegasus and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

    A.  Determining that this action is a proper class action;

    B.  Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    C.  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

    D.  Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 of

1    the Federal Rules of Civil Procedure and any appropriate state law remedies to assure

2    that the Class has an effective remedy; and

3        E.  Such other and further relief as the Court may deem just and proper.

4    **JURY TRIAL DEMANDED**

5    Plaintiff hereby demands a trial by jury.

6

7    Dated: September 5, 2007

8                                  **SCHUBERT & REED LLP**

9

10                                 Juden Justice Reed S.B.N. 153748

11                                 Aaron H. Darsky S.B.N. 212229
                                   Three Embarcadero Center, Ste. 1650

12                                 San Francisco, CA  94111
                                   Telephone:  (415) 788-4220

13                                 Facsimile:  (415) 788-0161

14

15                                 **KAHN GAUTHIER SWICK, LLC**
                                   Michael A. Swick

16                                 Kim E. Miller (S.B.N. 178370)
                                   12 East 41st Street, 12th Floor

17                                 New York, NY 10017
                                   Telephone:  (212) 696-3730

18                                 Facsimile:  (504) 455-1498

19

20                                 **KAHN GAUTHIER SWICK, LLC**
                                   Lewis S. Kahn

21                                 650 Poydras Street, Suite 2150
                                   New Orleans, LA 70130

22                                 Telephone: (504) 455-1400
                                   Facsimile: (504) 455-1498

23

24                                 **Attorneys for Plaintiff**

25

26

27

28

# EXHIBIT 1

**CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF**

*Nick Pournaras* (name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

1.    Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

2.    Plaintiff did not purchase securities of Pegasus Wireless Corp. at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the Class Period, plaintiff has executed transactions in the securities of Pegasus Wireless Corp. as follows  See Attached Schedule

5.    In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.    Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: ~~November      , 2006.~~

DECEMBER 15, 2006

_____
Plaintiff

| Date | Symbol | Description | Commission/Fees | Interest | Amount |
|------|--------|-------------|-----------------|----------|--------|
| 9/5/2006 | PGWC | SOLD 100 SHARES OF PGWC AT $1.81 | ($0.01) | $0.00 | $180.99 |
| 9/5/2006 | PGWC | SOLD 200 SHARES OF PGWC AT $1.81 | ($0.02) | $0.00 | $361.98 |
| 9/5/2006 | PGWC | SOLD 200 SHARES OF PGWC AT $1.81 | ($0.02) | $0.00 | $361.98 |
| 9/5/2006 | PGWC | SOLD 100 SHARES OF PGWC AT $1.81 | ($0.01) | $0.00 | $180.99 |
| 9/5/2006 | PGWC | SOLD 3401 SHARES OF PGWC AT $1.82 | ($0.20) | $0.00 | $6,189.62 |
| 9/5/2006 | PGWC | SOLD 1000 SHARES OF PGWC AT $1.82 | ($0.06) | $0.00 | $1,819.94 |
| 9/5/2006 | PGWC | SOLD 3000 SHARES OF PGWC AT $1.81 | ($0.17) | $0.00 | $5,429.83 |
| 9/5/2006 | PGWC | SOLD 300 SHARES OF PGWC AT $1.81 | ($0.02) | $0.00 | $542.98 |
| 9/5/2006 | PGWC | SOLD 10000 SHARES OF PGWC AT $1.90 | ($27.59) | $0.00 | $18,972.41 |
| 9/5/2006 | PGWC | SOLD 1400 SHARES OF PGWC AT $1.81 | ($27.08) | $0.00 | $2,506.92 |
| 9/5/2006 | PGWC | SOLD 299 SHARES OF PGWC AT $1.82 | ($0.02) | $0.00 | $544.16 |
| 8/24/2006 | PGWC | BOUGHT 2000 SHARES OF PGWC AT $5.72 | ($7.00) | $0.00 | ($11,447.00) |
| 5/26/2006 | PGWC | BOUGHT 100 SHARES OF PGWC AT $11.60 | $0.00 | $0.00 | ($1,160.00) |
| 5/26/2006 | PGWC | BOUGHT 200 SHARES OF PGWC AT $11.60 | $0.00 | $0.00 | ($2,320.00) |
| 5/26/2006 | PGWC | BOUGHT 500 SHARES OF PGWC AT $11.30 | $0.00 | $0.00 | ($5,650.00) |
| 5/26/2006 | PGWC | BOUGHT 600 SHARES OF PGWC AT $11.30 | $0.00 | $0.00 | ($6,780.00) |
| 5/26/2006 | PGWC | BOUGHT 200 SHARES OF PGWC AT $11.30 | $0.00 | $0.00 | ($2,260.00) |
| 5/26/2006 | PGWC | BOUGHT 500 SHARES OF PGWC AT $11.30 | $0.00 | $0.00 | ($5,650.00) |
| 5/26/2006 | PGWC | BOUGHT 200 SHARES OF PGWC AT $11.60 | $0.00 | $0.00 | ($2,320.00) |
| 5/26/2006 | PGWC | BOUGHT 100 SHARES OF PGWC AT $11.30 | $0.00 | $0.00 | ($1,130.00) |
| 5/26/2006 | PGWC | BOUGHT 800 SHARES OF PGWC AT $11.60 | ($7.00) | $0.00 | ($9,287.00) |
| 5/26/2006 | PGWC | BOUGHT 100 SHARES OF PGWC AT $11.30 | ($7.00) | $0.00 | ($1,137.00) |
| 5/26/2006 | PGWC | BOUGHT 700 SHARES OF PGWC AT $11.60 | $0.00 | $0.00 | ($8,120.00) |
| 5/8/2006 | PGWC | BOUGHT 200 SHARES OF PGWC AT $17.35 | $0.00 | $0.00 | ($3,470.00) |
| 5/8/2006 | PGWC | BOUGHT 450 SHARES OF PGWC AT $18.15 | $0.00 | $0.00 | ($8,167.50) |
| 5/8/2006 | PGWC | BOUGHT 706 SHARES OF PGWC AT $17.65 | ($7.00) | $0.00 | ($12,467.90) |
| 5/8/2006 | PGWC | BOUGHT 1000 SHARES OF PGWC AT $17.65 | $0.00 | $0.00 | ($17,650.00) |
| 5/8/2006 | PGWC | BOUGHT 94 SHARES OF PGWC AT $17.65 | $0.00 | $0.00 | ($1,659.10) |
| 5/8/2006 | PGWC | BOUGHT 200 SHARES OF PGWC AT $17.65 | $0.00 | $0.00 | ($3,530.00) |
| 5/8/2006 | PGWC | BOUGHT 600 SHARES OF PGWC AT $17.30 | $0.00 | $0.00 | ($10,380.00) |
| 5/8/2006 | PGWC | BOUGHT 1000 SHARES OF PGWC AT $17.30 | ($7.00) | $0.00 | ($17,307.00) |
| 5/8/2006 | PGWC | SOLD 5000 SHARES OF PGWC AT $16.26 | ($9.50) | $0.00 | $81,290.50 |
| 5/8/2006 | PGWC | BOUGHT 200 SHARES OF PGWC AT $17.25 | ($7.00) | $0.00 | ($3,457.00) |
| 5/8/2006 | PGWC | BOUGHT 550 SHARES OF PGWC AT $18.15 | ($7.00) | $0.00 | ($9,989.50) |
| 5/2/2006 | PGWC | BOUGHT 1800 SHARES OF PGWC AT $16.00 | ($7.00) | $0.00 | ($28,807.00) |
| 5/2/2006 | PGWC | BOUGHT 200 SHARES OF PGWC AT $16.00 | $0.00 | $0.00 | ($3,200.00) |
| 5/1/2006 | PGWC | BOUGHT 100 SHARES OF PGWC AT $14.50 | $0.00 | $0.00 | ($1,450.00) |
| 5/1/2006 | PGWC | BOUGHT 600 SHARES OF PGWC AT $14.90 | $0.00 | $0.00 | ($8,940.00) |
| 5/1/2006 | PGWC | BOUGHT 911 SHARES OF PGWC AT $15.65 | $0.00 | $0.00 | ($14,257.15) |

| | | | | | |
|---|---|---|---|---|---|
| 5/1/2006 | PGWC | BOUGHT 200 SHARES OF PGWC AT $14.50 | $0.00 | $0.00 | ($2,900.00) |
| 5/1/2006 | PGWC | BOUGHT 500 SHARES OF PGWC AT $14.90 | $0.00 | $0.00 | ($7,450.00) |
| 5/1/2006 | PGWC | BOUGHT 400 SHARES OF PGWC AT $14.90 | $0.00 | $0.00 | ($5,960.00) |
| 5/1/2006 | PGWC | BOUGHT 300 SHARES OF PGWC AT $14.50 | $0.00 | $0.00 | ($4,350.00) |
| 5/1/2006 | PGWC | BOUGHT 200 SHARES OF PGWC AT $14.50 | $0.00 | $0.00 | ($2,900.00) |
| 5/1/2006 | PGWC | BOUGHT 300 SHARES OF PGWC AT $14.50 | $0.00 | $0.00 | ($4,350.00) |
| 5/1/2006 | PGWC | BOUGHT 500 SHARES OF PGWC AT $14.50 | $0.00 | $0.00 | ($7,250.00) |
| 5/1/2006 | PGWC | BOUGHT 289 SHARES OF PGWC AT $15.65 | ($7.00) | $0.00 | ($4,529.85) |
| 5/1/2006 | PGWC | BOUGHT 1000 SHARES OF PGWC AT $14.90 | ($7.00) | $0.00 | ($14,907.00) |
| 5/1/2006 | PGWC | BOUGHT 300 SHARES OF PGWC AT $14.50 | ($7.00) | $0.00 | ($4,357.00) |
| 5/1/2006 | PGWC | BOUGHT 800 SHARES OF PGWC AT $15.65 | $0.00 | $0.00 | ($12,520.00) |
| 5/1/2006 | PGWC | BOUGHT 500 SHARES OF PGWC AT $14.90 | $0.00 | $0.00 | ($7,450.00) |
| 5/1/2006 | PGWC | BOUGHT 100 SHARES OF PGWC AT $14.50 | $0.00 | $0.00 | ($1,450.00) |
| 4/19/2006 | PGWC | BOUGHT 1000 SHARES OF PGWC AT $10.95 | ($7.00) | $0.00 | ($10,957.00) |
| 3/15/2006 | PGWC | BOUGHT 300 SHARES OF PGWC AT $10.00 | ($7.00) | $0.00 | ($3,007.00) |
| 3/15/2006 | PGWC | BOUGHT 700 SHARES OF PGWC AT $10.00 | $0.00 | $0.00 | ($7,000.00) |
| 1/20/2006 | PGWC | BOUGHT 500 SHARES OF PGWC AT $13.40 | ($7.00) | $0.00 | ($6,707.00) |
| 9/2/2005 | PGWC | BOUGHT 500 SHARES OF PGWC AT $6.95 | ($7.00) | $0.00 | ($3,482.00) |
| 9/2/2005 | PGWC | TAX EXEMPT DIVIDEND/SPINOFF OF 1000 SHARES OF PGWC | $0.00 | $0.00 | $0.00 |
| 8/2/2005 | PGWC | BOUGHT 865 SHARES OF PGWC AT $12.10 | $0.00 | $0.00 | ($10,466.50) |
| 8/2/2005 | PGWC | BOUGHT 135 SHARES OF PGWC AT $12.00 | $0.00 | $0.00 | ($1,620.00) |

12/15/2006   10:42   8434499785                    DR POURNARAS                    PAGE   06
TransactionsPrint                                                                  Page 1 of

# 1374

| Date | Symbol | Description | Commission/Fees | Interest | Amount |
|------|--------|-------------|-----------------|----------|--------|
| 9/5/2006 | PGWC | SOLD 2770 SHARES OF PGWC AT $1.90 | ($0.17) | $0.00 | $5,262.83 |
| 9/5/2006 | PGWC | SOLD 330 SHARES OF PGWC AT $1.90 | ($0.02) | $0.00 | $626.98 |
| 9/5/2006 | PGWC | SOLD 1400 SHARES OF PGWC AT $1.9001 | ($27.09) | $0.00 | $2,633.05 |
| 5/1/2006 | PGWC | BOUGHT 50 SHARES OF PGWC AT $14.70 | $0.00 | $0.00 | ($735.00) |
| 5/1/2006 | PGWC | BOUGHT 1450 SHARES OF PGWC AT $14.70 | ($7.00) | $0.00 | ($21,322.00) |
| 3/13/2006 | PGWC | BOUGHT 1000 SHARES OF PGWC AT $9.75 | ($7.00) | $0.00 | ($9,757.00) |
| 2/21/2006 | PGWC | BOUGHT 1000 SHARES OF PGWC AT $11.80 | ($7.00) | $0.00 | ($11,807.00) |
| 2/21/2006 | PGWC | BOUGHT 1000 SHARES OF PGWC AT $11.90 | ($7.00) | $0.00 | ($11,907.00) |

12/15/2006   10:42   8434499785                    DR POURNARAS                         PAGE 07

TransactionsPrint                                                                        Page 1 of

# 1751

| Date | Symbol | Description | Commission/Fees | Interest | Amount |
|------|--------|-------------|-----------------|----------|--------|
| 9/5/2006 | PGWC | SOLD 100 SHARES OF PGWC AT $1.90 | ($0.01) | $0.00 | $189.99 |
| 9/5/2006 | PGWC | SOLD 600 SHARES OF PGWC AT $1.9001 | ($27.04) | $0.00 | $1,113.02 |
| 9/5/2006 | PGWC | SOLD 4095 SHARES OF PGWC AT $1.90 | ($0.24) | $0.00 | $7,780.26 |
| 9/5/2006 | PGWC | SOLD 400 SHARES OF PGWC AT $1.90 | ($0.03) | $0.00 | $759.97 |
| 5/1/2006 | PGWC | BOUGHT 200 SHARES OF PGWC AT $14.55 | $0.00 | $0.00 | ($2,910.00) |
| 5/1/2006 | PGWC | BOUGHT 400 SHARES OF PGWC AT $14.59 | ($7.00) | $0.00 | ($5,843.00) |
| 5/1/2006 | PGWC | BOUGHT 500 SHARES OF PGWC AT $14.59 | $0.00 | $0.00 | ($7,295.00) |
| 5/1/2006 | PGWC | BOUGHT 100 SHARES OF PGWC AT $14.60 | $0.00 | $0.00 | ($1,460.00) |
| 5/1/2006 | PGWC | BOUGHT 1000 SHARES OF PGWC AT $14.59 | $0.00 | $0.00 | ($14,590.00) |
| 5/1/2006 | PGWC | BOUGHT 995 SHARES OF PGWC AT $14.55 | ($7.00) | $0.00 | ($14,484.25) |
| 9/2/2005 | PGWC | TAX EXEMPT DIVIDEND/SPINOFF OF 1000 SHARES OF PGWC | $0.00 | $0.00 | $0.00 |
| 8/2/2005 | PGWC | BOUGHT 300 SHARES OF PGWC AT $12.15 | $0.00 | $0.00 | ($3,645.00) |
| 8/2/2005 | PGWC | BOUGHT 500 SHARES OF PGWC AT $12.15 | $0.00 | $0.00 | ($6,075.00) |
| 8/2/2005 | PGWC | BOUGHT 200 SHARES OF PGWC AT $12.15 | ($7.00) | $0.00 | ($2,437.00) |

# 1350

| Date | Symbol | Description | Commission/Fees | Interest | Amount |
|------|--------|-------------|-----------------|----------|--------|
| 9/5/2006 | PGWC | SOLD 1200 SHARES OF PGWC AT $1.90 | ($0.07) | $0.00 | $2,279.93 |
| 9/5/2006 | PGWC | SOLD 300 SHARES OF PGWC AT $1.90 | ($27.02) | $0.00 | $542.98 |
| 5/1/2006 | PGWC | BOUGHT 100 SHARES OF PGWC AT $15.20 | $0.00 | $0.00 | ($1,520.00) |
| 5/1/2006 | PGWC | BOUGHT 200 SHARES OF PGWC AT $15.20 | $0.00 | $0.00 | ($3,040.00) |
| 5/1/2006 | PGWC | BOUGHT 700 SHARES OF PGWC AT $15.30 | ($7.00) | $0.00 | ($10,717.00) |
| 5/1/2006 | PGWC | BOUGHT 500 SHARES OF PGWC AT $15.20 | ($7.00) | $0.00 | ($7,607.00) |